## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RALPH CAUDILL, | ) |
| | ) |
| Plaintiff | ) |
| | ) Civil Action No. 10-303 |
| v. | ) |
| | ) Judge Donetta W. Ambrose |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) Electronic Filing |
| | ) |
| Defendant | ) |

## MEMORANDUM OPINION

November 2, 2010

### I. INTRODUCTION

Ralph Caudill ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381 - 1383f ("Act"). This matter comes before the court on cross motions for summary judgment. (Doc. Nos. 8, 10). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment will be DENIED.

## II.  PROCEDURAL HISTORY

Plaintiff filed for SSI and DIB with the Social Security Administration October 25, 2007, claiming an inability to work due to disability as of October 1, 2007 and February 15, 2006, respectively. (R. at 117 – 125)[1]. Plaintiff was initially denied benefits on December 28, 2007. (R. at 100 – 108). A hearing was scheduled for June 16, 2009, and Plaintiff appeared to testify represented by counsel. (R. at 25). A vocational expert, George Starosta, also testified. (R. at 25). The Administrative Law Judge ("ALJ") issued his decision denying benefits to Plaintiff on August 5, 2009. (R. at 7 – 24). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on January 27, 2010, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 4).

Plaintiff filed his Complaint in this court on March 3, 2010. Defendant filed his Answer on May 24, 2010. Cross motions for summary judgment followed.

## III.  STATEMENT OF THE CASE

### A.  General Background

Plaintiff was born January 20, 1980, and was twenty-nine years of age at the time of the administrative hearing. (R. at 117). Plaintiff dropped out of high school in the eleventh grade to pursue full-time employment. (R. at 274). Plaintiff left home at age seventeen and lived independently until 2006, when he moved in with his mother and step-father in their mobile home. (R. at 182, 274). This move was precipitated by an all-terrain vehicle ("ATV") accident in 2003 that resulted in Plaintiff fracturing a vertebra in his lumbar spine, and subsequently losing his job (R. at. 36, 274). Prior to the ATV accident, Plaintiff had worked for two and one

---

Citations to Doc. Nos. 6 – 6-8, the Record, *hereinafter*, "R. at ___."

2

half years at a local contracting company. (R. at 275). Plaintiff did take some part-time work after the ATV accident, but left those jobs because he did not feel he could keep up due to his pain. (R. at 275). Plaintiff's lack of full-time employment led him to return to his parents' home. (R. at 182). Plaintiff now subsists on welfare benefits from the state and monetary support from his parents. (R. at 51, 58, 190). Plaintiff had previously applied for DIB and SSI, but was denied both on September 25, 2006. (R. at 78 – 94).

    *B. Medical History*

    The record in this case includes the medical notes of Plaintiff's primary care physician, Joanna Swauger, D.O., spanning October of 2006 to June of 2009. However, Plaintiff claimed that Dr. Swauger had been his primary care physician for seven years. (R. at 56). Regardless, Dr. Swauger examined and treated Plaintiff for his back condition throughout the period provided in the record.

    Beginning with the first visit on record on October 9, 2006, Plaintiff presented with back pain but was noted as having failed to take earlier prescribed medications for his pain, as recommended. (R. at 451). Plaintiff had a smooth, even, and well-balanced gait, normal spine strength, good range of motion, and no muscular tenderness or spasm. (R. at 451 – 52). Plaintiff did have back and leg pain during leg raising tests. (R. at 452). Plaintiff was diagnosed with chronic lower back pain/ lumbago, and neuralgia/neuritis/radiculitis. (R. at 452). Plaintiff was encouraged to attend physical therapy, and go to a pain clinic for help coping with his back condition. (R. at 452). Dr. Swauger also suggested Plaintiff seek job training with the state welfare office to prepare him for non-labor related employment. (R. at 452).

    Though Plaintiff eventually would begin seeking treatment at a pain management clinic and began consistently taking prescribed pain medications, he continued to see Dr. Swauger for

back pain. Dr. Swauger's physical findings were relatively unchanged throughout the remainder of her treatment of Plaintiff. She continued to recommend that Plaintiff seek job training for sedentary work. (R. at 310). Dr. Swauger also diagnosed Plaintiff with disc disorder with lumbar myelopathy. (R. at 310). She indicated that losing weight could provide Plaintiff with relief. (R. at 315).

On September 16, 2008, Plaintiff visited Dr. Swauger for a preoperative examination. (R. at 387). As a result of Plaintiff's unabated pain, he was to undergo a fusion of his lumbar spine. (R. at 387). Dr. Swauger noted that recent magnetic resonance imaging ("MRI") of Plaintiff's back indicated that he suffered from a disc herniation and spinal stenosis. (R. at 387). Plaintiff was also walking with a slightly antalgic left gait. (R. at 388). Plaintiff's diagnosis of disc disorder with lumbar myelopathy remained the same, but Dr. Swauger also diagnosed Plaintiff with depressive disorder. (R. at 389).

Following the surgery on June 2, 2009, Plaintiff returned to Dr. Swauger because of new back pain. (R. at 468). The pain was now in the middle of his back, though his surgery had relieved much of the pain in his lower back. (R. at 468). Dr. Swauger diagnosed Plaintiff with pain in the neck/cervicalgia, and thoracic spine pain. (R. at 470). Dr. Swauger suspected that the pain was primarily muscular in origin, as her examination found no neurological symptoms. (R. at 470). She generally believed that Plaintiff's complained of symptoms were out of proportion to her examination findings, and that physical therapy would likely provide relief. (R. at 470). Plaintiff was noted as failing to exercise and only inconsistently following his diet plan. (R. at 468).

In a report dated June 4, 2009, Dr. Swauger assessed Plaintiff's physical condition and functional limitations. (R. at 441 – 48). Plaintiff was diagnosed as suffering from muscle strain

4

of the neck and thoracic spine. (R. at 441). Muscle spasm and a moderate degree of pain were noted. (R. at 445). Plaintiff was given a fair to good prognosis and was noted as requiring physical therapy. (R. at 442). While Plaintiff was considered to have a "permanent disability" in the form of ongoing back pain, Dr. Swauger also indicated that he would be able to "engage in employment on a regular, sustained, competitive and productive basis." (R. at 443). Plaintiff would, however, have the following functional boundaries: Plaintiff would be able to sit eight hours of an eight hour workday; Plaintiff could stand two to four hours; Plaintiff could walk one to two hours; Plaintiff could drive four hours; Plaintiff could continuously lift up to ten pounds and frequently lift up to twenty pounds; Plaintiff could not use his left foot for repetitive movements or foot controls; Plaintiff could not bend, squat, crawl, or climb, and could only occasionally reach above shoulder level; and, Plaintiff could not participate in activities involving unprotected heights. (R. at 444). Plaintiff would also need the ability to rest as needed during the day, and would occasionally miss work because of pain. (R. at 445).

Plaintiff visited John Park, M.D. for pain management approximately twenty-four times between November of 2006 and March of 2009. (R. at 343 – 56, 411 – 426). Dr. Parks administered numerous transforaminal injections to relieve Plaintiff's back pain and continuously provided prescription pain medication. (R. at 343 – 56, 411 – 426). Plaintiff reported that the injections typically provided him with relief from his pain. (R. at 343 – 56, 411 – 426). During Plaintiff's visits, Dr. Park generally made the same observations of Plaintiff's condition: he exhibited a normal gait and did not require an assistive device to walk; he had full range of motion in his back; his sensory examinations were unremarkable; motor power examinations in both the upper and lower extremities were five on a scale of five; and, there was tenderness on palpitation of the low back, paralumbar muscle region, and/ or left hip muscle

5

region. (R. at 411 – 426). In all other respects, Plaintiff appeared normal. (R. at 343 – 56, 411 – 426). In neurological testing, Dr. Park consistently found that Plaintiff was alert and oriented, and had a good attention span. (R. at 343 – 56, 411 – 426). At Plaintiff's final visit on record with Dr. Park on March 6, 2009, his pain was noted as being only four on a scale of ten, though it had typically been worse. (R. at 343 – 56, 411 – 426). Dr. Parks made no functional limitations findings in his medical notes. Over the course of his treatment with both Dr. Swauger and Dr. Park, Plaintiff was prescribed Lorcet, Naprosyn, Soma, Oxycontin, OxyIR, Percocet, and Roxicodone, variously, to treat his pain.

Plaintiff consulted with neurosurgeons regarding the possibility of relieving his pain by surgical intervention. On September 27, 2006 Plaintiff visited Matt El-Kadi, M.D., Ph.D. (R. at 449). Dr. El-Kadi determined that there was no surgical indication apparent for Plaintiff at that time. (R. at 449). Plaintiff suffered from back pain, but Dr. El-Kadi believed that if Plaintiff wore a lumbar binder and sought treatment at a pain clinic he would find greater relief from pain than through surgery. (R. at 449).

Following two appointments at the Department of Neurosurgery at Allegheny General Hospital on July 21 and August 26 of 2008, with Bennet Blumenkopf, M.D., and James Burgess, M.D., it was determined that Plaintiff should undergo a transforaminal lumbar interbody fusion at the L3-L4 level of the spine. (R. at 460 – 61, 465 – 67). At that time, it was found that Plaintiff suffered extravasation and degeneration at L3-L4, and Plaintiff exhibited moderate thecal sac compression, bilateral recess narrowing, and significant endplate degeneration. (R. at 465). The operation was performed by Dr. Burgess on September 22, 2008. (R. at 390 – 410).

6

## C. Functional Limitations Assessments

Plaintiff received numerous functional capacity assessments as a result of seeking state welfare benefits, and twice seeking social security benefits. On August 23, 2006, John Carosso, Psy.D. completed testing and a clinical psychology evaluation for the Pennsylvania Bureau of Disability Determination. (R. at 273). At that time, Plaintiff denied any history of mental health treatment or significant emotional concerns. (R. at 273). Dr. Carosso concluded that as a result of Plaintiff's ATV accident and resultant pain and loss of daily functioning, Plaintiff suffered from an adjustment disorder. (R. at 278). Plaintiff was determined to require additional time to follow through with directives due to his depressive symptomology and limited attention span. (R. at 278). Plaintiff also suffered from mild cognitive impairment. (R. at 278). Plaintiff would have difficulty with any task requiring sustained mental effort, and would have difficulty managing daily stress because of his mild depressive symptoms and physical pain. (R. at 278). As a result he would be 'slightly' limited in understanding and remembering detailed instructions, and in carrying out detailed instructions. (R. at 278 – 81). Plaintiff received a 'fair' prognosis, however. (R. at 278 – 81). No other limitations were noted. It was concluded that Plaintiff's periods of depression were not indicative of emotional impairment precluding employment. (R. at 280).

A psychiatric review technique form ("PRTF") completed by Richard Heil, Ph.D. on September 21, 2006 for purposes of Plaintiff's first DIB and SSI determination, noted that Plaintiff had only mild limitations in activities of daily living and in maintaining social functioning. (R. at 297). Plaintiff had moderate difficulty maintaining concentration, persistence, or pace, but had no repeated episodes of decompensation of extended duration. (R. at 297).

7

These findings were made with regard to 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, Section 12.04 (Affective Disorders) and 12.05 (Mental Retardation). (R. at 287).

Dr. Heil also completed a mental residual functional capacity ("RFC") assessment on September 21, 2006. (R. at 283). Plaintiff was found to be moderately limited in the following respects: ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to respond appropriately to changes in work setting. (R. at 284). No other limitations were found. While Plaintiff suffered from adjustment disorder with depressed mood, and borderline intellectual functioning, he was able to meet the mental demands of competitive work. (R. at 285). Plaintiff had no mental health-related hospitalizations and had little to no recorded psychological treatment. (R. at 285).

Another PRTF was completed by Douglas Schiller, Ph.D. on December 13, 2007. (R. at 357). Dr. Schiller found Plaintiff suffered from no medically determinable impairments. (R. at 357). Dr. Schiller based his decision upon the fact that Plaintiff was not taking psychiatric medications, was not seeing a mental health professional or therapist, and had no inpatient treatments for his mental health. (R. at 369). No limitations findings were made.

On May 19, 2009, Plaintiff was examined by Lindsey A. Groves, Psy.D. at the behest of Plaintiff's counsel. (R. at 427). A number of intelligence tests were conducted by Dr. Groves which indicated that Plaintiff had a borderline range of intellectual functioning with a full scale IQ of 72. (R. at 427). Dr. Groves opined that testing indicated Plaintiff was unable to process information, and his visual short-term memory, psychomotor and processing speed, and visual-

8

motor coordination were severely impaired. (R. at 428). Testing showed Plaintiff had severe impairments in attention and concentration, and marked impairments in simple and complex processing and sequencing. (R. at 428). Plaintiff also exhibited severe impairment in perceptual and visual-spatial skills. (R. at 428). Plaintiff was diagnosed with bipolar disorder and borderline intellectual functioning. (R. at 429). His prognosis was poor and he required mental health care. (R. at 430). Dr. Groves concluded that Plaintiff was one hundred percent disabled without psychological treatment and would still be eighty percent disabled even with such treatment. (R. at 431).

Specifically, Dr. Groves noted that Plaintiff was 'poor' in the following areas: ability to maintain attention/ concentration; ability to understand, remember, and carry out detailed, but not complex, job instructions; ability to understand, remember, and carry out simple job instructions; and intellectual ability, thought organization, memory, comprehension, etc. (R. at 437 – 38). Plaintiff was also determined to have moderate restriction in activities of daily living, and marked restriction in maintaining social functioning and maintaining concentration, persistence, or pace. (R. at 435). Dr. Groves indicated that Plaintiff had suffered three episodes of decompensation of extended duration. (R. at 435). She also indicated that she believed Plaintiff qualified for social security disability benefits because he met the listing requirements for affective disorder and deficient intellectual functioning. (R. at 431).

Two physical RFCs were completed, as well. On September 22, 2006, state agency consultant Ronald Krynicky concluded that Plaintiff's medically determinable impairments were disc herniation with neural encroachment at L3-L4, and remote compression fracture at L1. (R. at 307). Mr. Krynicky believed that Plaintiff was capable of occasionally lifting fifty pounds and frequently lifting twenty-five. (R. at 303). Plaintiff could stand or walk six hours of an eight

9

hour workday, and sit six. (R. at 303). Plaintiff could frequently climb, balance, stoop, kneel, crouch, and crawl, but was not otherwise limited. (R. at 304). Mr. Krynicky reasoned that Plaintiff was not as limited as claimed because his physical and neurological exams were largely unremarkable. (R. at 307).

Abu N. Ali, M.D. made essentially the same findings in a December 17, 2007 physical RFC. (R. at 375). Dr. Ali did further limit Plaintiff, however, with respect to extreme cold, extreme heat, wetness, humidity, and fumes. (R. at 373). Dr. Ali concluded that Plaintiff suffered from a medically determinable impairment in the form of lower back pain. (R. at 375). Dr. Ali concluded that Plaintiff was not as limited as claimed because Plaintiff's treatment for his back pain was successful, he did not attend physical therapy, he did not require an assistive device to walk, heating patches and lying down relieved his pain, and pain medication effectively controlled his pain. (R. at 375).

### D. Administrative Hearing

At his hearing, Plaintiff testified that he completed tenth grade and left school in the eleventh grade. (R. at 30). Plaintiff could do basic math, reading, and writing. (R. at 30). However, Plaintiff did require some remedial 'special education' classes for reading and math. (R. at 30).

Plaintiff's last job was with a home-care provider. (R. at 31). He was responsible for aiding the disabled at home during the day by cooking, cleaning, and doing other chores. (R. at 31). Plaintiff held this job for four and one half to five months, and quit just one week prior to the hearing. (R. at 31). Plaintiff was required to work twenty-two hours a week, four to five days a week. (R. at 31 – 35). Plaintiff began consistently missing one day of work a week, and asked that his hours be reduced because of his back pain. Plaintiff's employer was not willing to make

10

such a concession, and both Plaintiff and his employer agreed his employment could not continue. (R. at 31 – 32). Plaintiff's last full-time job before the caretaker position was as a laborer for a contractor. (R. at 33, 58). Plaintiff's employment with the contractor ended following his ATV accident in 2003. (R. at 33). Since that time, Plaintiff survived on state welfare benefits and help from his parents. (R. at 33, 58).

Plaintiff testified that he could only lift his sixty pound son for three to four minutes. (R. at 35). He had difficulty walking up stairs, because when he lifted his left leg it would throw out his back. (R. at 35). Plaintiff would have days when his back would present no problems, and days where only slight activity could create severe pain. (R. at 38 – 39). The pain would often require Plaintiff to frequently take his pain medications, though it often required little to no pain medication. (R. at 59). Plaintiff could only sit for fifteen to twenty minutes, and could only stand for fifteen to twenty minutes, if able to move around. (R. at 43). Plaintiff could walk thirty to fifty yards at a time, but avoided uneven surfaces. (R. at 44, 59). Following Plaintiff's surgery, he stated that his lower back pain was much improved, but that he began to have pain in the middle of his back. (R. at 39). Plaintiff slept between four and eight hours a day and was often awakened by back and leg pain. (R. at 58). Plaintiff stated that Dr. Swauger limited his lifting to only twenty pounds, but he believed that this was still too heavy – about eight to ten pounds was what he believed he was capable of carrying. (R. at 39, 59). He also stated that he failed to exercise and lose weight as Dr. Swauger recommended. (R. at 44).

Plaintiff testified that much of his mental condition was due to the fact that he had no income from employment. (R. at 37). He said that Dr. Swauger prescribed a medication for his mental health, but he did not take it because of its effects. (R. at 48). Dr. Swauger did not prescribe any other psychiatric medications after that. (R. at 48). Plaintiff never engaged in

11

counseling and was never hospitalized for any mental health-related issues. (R. at 48). Plaintiff also testified that he had been feeling better, more recently. (R. at 48).

At one point after his ATV accident, Plaintiff attempted to work as a dump truck driver, but could not lift his left leg to change gears, and so never started the job. (R. at 47). Otherwise, Plaintiff had not applied for work because he feared getting fired as a result of his physical ailments. (R. at 51). Plaintiff did not take Dr. Swauger's advice regarding retraining for sedentary work because he did not feel that he could handle it. (R. at 57).

During most days, Plaintiff tried to read as much as possible, but often had difficulty with comprehension. (R. at 52). Plaintiff spent the day lying down for at least four hours at a time. (R. at 54). Plaintiff fished approximately three hours every week. (R. at 52). Plaintiff also took care of his son every other weekend and Wednesday. (R. at 55). Plaintiff took his son fishing and swimming. (R. at 55).

## IV. STANDARD OF REVIEW

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[2] and 1383(c)(3)[3]. Section 405(g) permits a district court to review

---

[2]

Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[3]

Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

12

transcripts and records upon which a determination of the Commissioner is based. When reviewing a decision, the district court's role is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact. *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. §706.

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster*

---

42 U.S.C. § 1383(c)(3).

13

*v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). The ALJ must utilize a five-step sequential analysis when evaluating the disability status of each claimant. 20 C.F.R. §404.1520.

The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas,* 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler,* 790 F.2d 26, 28 (3d Cir. 1986).

## V.    DISCUSSION

The ALJ found Plaintiff could perform light work, except that there could be no pushing or pulling in the lower left extremity, no bending squatting, crawling, or climbing, no more than occasionally reaching above shoulder height, no exposure to heights, no concentrated exposure to temperature extremes, humidity, and pulmonary irritants, and only simple routine work that can be learned in thirty days or less involving short simple instructions, no production rate pace, with simple work related decisions with few workplace changes, no requirement to read instructions, write reports, or do math calculations, and no more than occasional interaction with

14

the public. (R. at 15). According to the vocational expert at the administrative hearing, a significant number of jobs were available in the national economy, even with these restrictions. (R. at 64 – 66). Plaintiff was therefore found not disabled. (R. at 10 – 23).

In his motion, Plaintiff claims that the ALJ erred in finding him not disabled for purposes of receiving DIB and SSI. Plaintiff objected to the ALJ's failure to find Plaintiff disabled according to 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, Section 1.04 and 12.04, failure to consider Plaintiff's alleged obesity, and failure to give proper weight to the findings of Dr. Groves as opposed to the other consulting physicians. (Doc. No. 9 at 3 – 4). Defendant argued that the ALJ properly analyzed all relevant, credible evidence, and therefore provided substantial evidence to back his determination against Plaintiff. (Doc. No. 11 at 2).

Plaintiff first argues that the ALJ failed to adequately analyze the effect of Plaintiff's alleged obesity on his functional limitations. (Doc. No. 9 at 11). Plaintiff cites S.S.R. 02-1P as support for his contention that obesity is a factor that must be considered by the ALJ, particularly as it applies to Section 1.04 (Disorders of the Spine). (*Id.*).

S.S.R. 02-1P instructs that when establishing the existence of obesity, the ALJ should rely upon the findings of a physician who has examined and reported Plaintiff's appearance, build, height, and weight. *Id.* at 3. Even if a finding of obesity is never made by an examining medical professional, the ALJ may use his or her judgment in finding a claimant is obese based upon information in the record indicating that a claimant has consistently high weight or body mass. *Id.* Plaintiff argues that in addition to the above ruling, the case of *Poulos v. Commissioner of Social Security*, 474 F.3d 88 (3d Cir. 2007), supports his contention that the failure to consider his obesity was a fatal error by the ALJ.

15

However, Plaintiff's argument is unavailing. The present case and *Poulos* can be easily distinguished based upon the facts: *Poulos* involved a five foot six inch tall, five hundred pound claimant seeking disability based upon morbid obesity, existing since birth, with resultant knee pain, back strain, shortness of breath, and slowed movement; here, Plaintiff – at five feet eleven inches tall and two hundred fifty pounds as of March 6, 2009 – merely asserts in his motion that he was obese, without providing a basis for the assertion from the record, and while at the same time acknowledging that his physical condition – including "obesity" – was the result of his ATV accident. (R. at 426). In *Poulos*, the claimant's obesity created easily identifiable limiting physical problems, and even caused claimant to break chairs. *Poulos*, 474 F.3d at 90.

While his subsequent weight gain may have exacerbated his back pain, Plaintiff's weight was never an issue presented to the ALJ. At no point anywhere in the record provided was there any objective finding by any medical source indicating Plaintiff was obese. It was, on occasion, noted that Plaintiff was overweight and that his weight may have contributed to his back pain: Dr. Blumenkopf noted that plaintiff was a "somewhat husky gentleman in no acute distress"; and, Dr. Swauger noted that Plaintiff was "moderately overweight," but healthy and well-developed. (R. at 309, 313 – 15, 388, 469, 451, 460). Yet, nowhere did any objective medical evidence or medical professional attribute functional limitations to Plaintiff's weight.

Plaintiff, himself, never attributed any of his claimed functional limitations to his weight. The ALJ did in fact consider that Plaintiff was "moderately overweight," and Plaintiff provides no explanation as to how this finding creates additional limitations not accommodated in the ALJ's RFC assessment. Insofar as Plaintiff's weight may have contributed to his back condition, it is the court's opinion that its effects were adequately accommodated by the functional limitations findings made by the ALJ with respect to Plaintiff's back and leg pain.

Plaintiff next argues that the ALJ incorrectly determined that he was not disabled under Section 12.04 (Affective Disorder) when he rejected the disability findings of Dr. Groves in favor of those of Drs. Carosso, Heil, and Schiller. (Doc. No. 9 at 12 – 13). Plaintiff claims that the ALJ erred similarly in formulating his RFC assessment. (*Id.* at 13). Dr. Groves' opinions were allegedly entitled to controlling weight because she was an acceptable medical source under the regulations, and a treating physician. (*Id.*).

First, it is the sole province of the ALJ to make credibility and disability findings based upon the evidence of record. *Zonack v. Commissioner of Social Security*, 290 Fed. Appx. 493, 497 (3d Cir. 2008). *See Adorno v. Shalala*, 40 F.3d 43, 47 – 48 (3d Cir. 1994); 20 C.F.R. § 416.927(e), 404.1527(e). Simply because an acceptable medical source, treating or otherwise, concludes that a claimant is disabled, the ALJ is not compelled to adopt such a finding. *Id.* Disability determinations are not medical findings. *Id.* While a medical professional's opinion on disability may be probative, it is not entitled to any deference.

Second, every medical professional's opinion must be supported by objective medical evidence on the record – regardless of whether the source was a treating source, or not. *Ginther v. Commissioner of Social Security*, 2010 WL 2253748 at 8 (W.D.Pa. 2010). Without support, an ALJ is free to reject any opinion for lack of credibility – in fact, an ALJ is required to do so. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). Further, a consulting medical professional's opinion is not necessarily entitled to lesser weight than any other's. *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000).

In this case, Dr. Groves was no more than a consulting physician, analyzing Plaintiff's mental condition on one occasion for purposes of DIB and SSI eligibility. She was not a treating physician with an established history of objective medical observation of Plaintiff's condition –

17

certainly not more than Dr. Swauger. A *treating* physician's opinions may be entitled to great weight based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F.2d 1348, 1350 (3d Cir. 1987)). Dr. Groves did not fit this description.

The ALJ provided substantial evidence to show that Plaintiff was not disabled under Section 12.04. Section 12.04 requires that for a claimant to be considered disabled, Parts A and B must be met, or Part C must be met. As the ALJ explained, while Part A may arguably have been satisfied, Part B clearly was not. Part B requires "at least two of the following: 1. Marked restriction in activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, Sec. 12.04. Dr. Groves indicated that Plaintiff was markedly limited as to 2 and 3, and had three episodes of decompensation, entitling him to disability benefits. (R. at 435). These conclusions find little support in the record.

Plaintiff himself averred that prior to losing his previous employment, he lived independently outside his parents' home since age seventeen, managed his finances, and maintained full-time work – without a high school diploma – until the time of his ATV accident. (R. at 185 – 86, 274 - 75). Even now, aside from living with and receiving support from his parents, Plaintiff continues to function independently, makes meals, helps around the house, goes fishing, drives, and cares for his son. (R. at 45, 52, 55). There was no evidence of any psychological difficulties that had impeded Plaintiff's ability to work prior to Dr. Groves' assessment, and Plaintiff had denied as much himself. (R. at 274).

18

Additionally, Plaintiff described his depression as periodic and short-lived. (R. at 274, 276). Plaintiff was not hospitalized for any mental condition, nor did he ever receive any counseling or therapy. (R. at 47 - 49). Plaintiff only briefly took medication prescribed by Dr. Swauger, but quit because he did not like the side effects. (R. at 47 - 49). Dr. Swauger never prescribed anything else. (R. at 47 - 49). Dr. Swauger, aside from once noting Plaintiff suffered from some degree of depression, never made any medical notes regarding the severity of Plaintiff's mental condition or any resultant limitations, over years of treatment as his primary care physician. (R. at 389).

Also, Dr. Carosso – like Dr. Groves – had personally evaluated Plaintiff and conducted a mental examination, and yet he found none of the moderate or marked psychological limitations noted by Dr. Groves. (R. at 273). Drs. Heil and Schiller likewise did not find the same degree of functional mental limitation after reviewing Plaintiff's medical history. (R. at 283 – 99, 357 – 68). These doctors generally acknowledged that Plaintiff suffered from affective disorder and cognitive difficulty, but saw no evidence suggesting such profound limitation as indicated by Dr. Groves in her single evaluation of Plaintiff. None of these doctors made findings sufficient to satisfy the requirements of Part B. As such, the ALJ did not err in finding Part B was not satisfied, in light of the contradictory opinions of three consulting medical professionals, and Plaintiff's medical history as a whole. Plaintiff does not argue that Part C was satisfied, and the court finds – as did the ALJ – that it was not met.

In a similar vein, Plaintiff argues that the ALJ's RFC was inadequate, in part, because he incorporated a limitation that Plaintiff's work include only those tasks which could be learned in thirty days or less involving short, simple instructions. (Doc. No. 9 at 17). Plaintiff contends that this was error because Dr. Groves determined that Plaintiff had no ability to understand,

19

remember, and carry out simple job instructions. (*Id.*). Further, Plaintiff asserts that the ALJ failed to accommodate Dr. Groves' finding that Plaintiff was limited in maintaining attention, concentration, persistence, and pace. (*Id.* at 13).

While it is error for an ALJ to reject uncontradicted medical evidence without a clear reasoning for doing so, such is not the case at hand. *Cotter*, 642 F.2d at 706. As discussed above, Dr. Groves' conclusions fly in the face of the weight of objective and subjective evidence on the record, and does not render the ALJ's RFC inadequate. Dr. Schiller determined Plaintiff was not limited in any way. (R. at 357 – 69). Dr. Heil determined Plaintiff was only moderately limited in terms of concentration, persistence, or pace, and the ability to understand, remember, and carry out instructions. (R. at 283 – 99). Dr. Carosso found Plaintiff exhibited only slight limitation in understanding, remembering, and carrying out instructions. (R. at 273 – 80). Dr. Carosso also determined that Plaintiff's attention was variable and he therefore had difficulty maintaining sustained mental effort. (R. at 273 – 80). Yet, Dr. Carosso opined that Plaintiff would simply require additional time to complete directives. (R. at 273 – 80). Lastly, Dr. Carosso found Plaintiff to exhibit only mild cognitive impairment. (R. at 273 – 80). In light of the impairments noted by the three consulting physicians, in contrast to the relatively extreme findings of Dr. Groves, the ALJ's RFC assessment sufficiently accommodated Plaintiff's credibly established mental impairments.

Plaintiff next argues that when the ALJ adopted Dr. Swauger's findings that Plaintiff could not bend, squat, crawl, or climb, previous Social Security rulings 83-10, 83-14, and 85-15, excluded Plaintiff from light exertional work. (*Id.* at 14).

S.S.R. 83-14 regarding the capability to do work, states that "to perform substantially all of the exertional requirements of *most* sedentary and light jobs, a person would not need to

crouch and would need to stoop only occasionally (from very little up to one-third of the time, depending upon the particular job)." *Id.* at 2 (emphasis added). That light work may require the "frequent lifting or carrying of objects weighing up to 10 pounds (which is required for the *full* range of light work) implies that the worker is able to do occasional bending of the stooping type." *Id.* at 4 (emphasis added). The ruling goes on to say that a limitation of this requirement "must be considered very carefully to determine its impact on the size of the remaining occupational base of a person who is otherwise found functionally capable of light work." *Id.*

These statements, however, are a far cry from excluding a claimant from all light work because he cannot crouch or stoop at all. Indeed the court is hard pressed to find – and Plaintiff failed to directly cite – any statement within the cited Social Security rulings which supports his claim that he was excluded from all light work because he could not bend, squat, crawl, or climb. If anything, the rulings merely imply that the occupational range of light work available to a person with Plaintiff's limitations will be relatively restricted.

In this case, a vocational expert was brought in to do what the rulings required, which is to determine what – if any – light work would be available to a person with Plaintiff's limitations. The vocational expert determined that there were a significant number of light exertional jobs in the national economy that Plaintiff could perform even with his limitations. The vocational expert found that with the enumerated limitations, Plaintiff was capable of performing the job of laundry "folder," with 100,000 positions in the national economy, "general office helper," with 300,000 positions, and "mail clerk," with 150,000 positions. (R. at 63 – 65). Plaintiff failed in his motion to refute the veracity of the vocational expert's determination. This court likewise has no basis for determining that light work would not be available to a person with the limitations enumerated by the ALJ.

Finally, Plaintiff claims that the ALJ erred in failing to properly consider his subjective complaints of pain. (Doc. No. 9 at 14). The ALJ allegedly failed to properly conduct a two-prong analysis of the subjective complaints required by S.S.R. 96-7P by failing to explicitly consider each factor under prong two[4]. (*Id.*).

An ALJ is required to accord subjective complaints of pain the same treatment as objective medical reports, and weigh the evidence before him. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 122 (3d Cir. 2000). An ALJ must also give a claimant's subjective description of his or her inability to perform light or sedentary work serious consideration. *Schaudeck v. Commissioner of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999), 181 F.3d at 433. However, while serious consideration must be given where a medical condition could reasonably produce the complained of symptoms, these allegations must be consistent with the objective medical evidence on record. *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985); *Burnett*, 220 F.3d at 122.

---

4

S.S.R. 96-7P provides in pertinent part:

> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.
> ***
> [F]actors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

S.S.R. 96-7P at 2 – 3.

In the present case, the ALJ provided extensive findings from the record that countered Plaintiff's subjective complaints. In response to Plaintiff's claims regarding his back pain, the ALJ cited an earlier statement by Plaintiff that his surgery had alleviated much of his lower back pain, and further, that Dr. Swauger believed Plaintiff's lumbar back pain had been resolved. (R. at 39, 470). The ALJ also noted that Plaintiff's more recent claims of back pain were considered by his long-treating primary care physician, Dr. Swauger, to be out of proportion to objective physical findings. (R. at 470). Dr. Swauger noted that while Plaintiff would continue to suffer back pain, he could maintain employment with certain recommended accommodations. (R. at 443). The ALJ relied upon Dr. Swauger's limitations findings in justifying his determination. Plaintiff's prognosis was fair to good, and Dr. Swauger's physical capacities evaluation was largely mirrored by the ALJ's RFC assessment. (R. at 442 – 44). A June 2, 2009 x-ray of Plaintiff's spine found that Plaintiff's intervertebral spaces were normal, the odontoid, intervertebral foramina, pedicles, and spinous processes were normal, and there was no significant soft-tissue abnormality. (R. at 471). Dr. Ali and Mr. Krynicky did not find Plaintiff disabled in their consultative examinations. (R. at 302 – 08, 370 – 76). No other physicians found Plaintiff to be physically disabled from full-time employment.

Plaintiff specifically alleged that the ALJ failed to consider the intensity of Plaintiff's pain, Plaintiff's pain medications and injections, and the effectiveness of these treatments. (Doc. No. 9 at 14 – 15). Assuming that the failure to discuss these points would render the ALJ's two prong analysis of Plaintiff's subjective complaints incomplete, the court finds that the above mentioned factors were sufficiently addressed. The ALJ detailed Plaintiff's treatment with Drs. Swauger and Park, discussed the objective testing conducted by both, discussed the use of injections and Roxicodone for pain management, and discussed the frequency and consistency of

23

Plaintiff's treatment. (R. at 16 – 19). Based upon the subjective and objective evidence put forth by the ALJ to refute the severity of Plaintiff's subjective complaints of pain, it is clear substantial evidence supported the ALJ's decision.

## VI. CONCLUSION

Based upon the foregoing, the ALJ presented substantial evidence to support his determination that Plaintiff was not so physically or psychologically limited so as to preclude him from full-time, substantial gainful activity.

Accordingly, Plaintiff's Motion for Summary Judgment will be denied, Defendant's Motion for Summary Judgment will be granted, and the decision of the ALJ will be affirmed. An appropriate order follows.

*s/ Donetta W. Ambrose*
Donetta W. Ambrose
United States District Judge

cc/ecf: E. David Harr, Esq.
203 South Main Street
Greensburg, PA 15601
(724) 834-9124

Christy Wiegand, Esq.
United States Attorney's Office (PGH)
700 Grant Street
Suite 4000
Pittsburgh, PA 15219
(412) 644-3500

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RALPH CAUDILL, | ) |
| | ) |
| Plaintiff | ) |
| | ) Civil Action No. 10-303 |
| v. | ) |
| | ) Judge Donetta W. Ambrose |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) Electronic Filing |
| | ) |
| Defendant | ) |

## ORDER OF COURT

AND NOW, this 2nd day of November, 2010, in accordance with the foregoing Memorandum Opinion,

IT IS HEREBY ORDERED that Defendant Michael J. Astrue, Commissioner of Social Security's Motion for Summary Judgment [10] is GRANTED, Plaintiff Ralph Caudill's Motion for Summary Judgment [8] is DENIED, and the decision of the Commissioner of Social Security is AFFIRMED, pursuant to the fourth sentence of 42 U.S.C. § 405(g).

*s/Donetta W. Ambrose*
Donetta W. Ambrose
United States District Judge

cc/ecf: E. David Harr, Esq.
203 South Main Street
Greensburg, PA 15601
(724) 834-9124

Christy Wiegand, Esq.
United States Attorney's Office (PGH)
700 Grant Street
Suite 4000
Pittsburgh, PA 15219
(412) 644-3500